**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| NOEMI VALDIVIA,<br><br>Plaintiff,<br><br>v.<br><br>TOWNSHIP HIGH SCHOOL DISTRICT 214,<br><br>Defendant. | Case No. 16-cv-10333<br><br>Judge Sidney I. Schenkier |

**PLAINTIFF'S RESPONSE IN OPPOSITION TO
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Willful blindness cannot obviate an employer's obligations under the FMLA or Title VII. Similarly, genuine issues of material fact cannot be avoided by ignoring them. In June of 2016, Noemi Valdivia began experiencing depression and anxiety, which manifested through her aberrant behavior that escalated until she suddenly resigned. Although Plaintiff tried to rescind her resignation, Defendant would not allow it. Within days, Plaintiff was hospitalized, diagnosed, and medicated for severe major depressive disorder and anxiety disorder. Despite the evidence supporting these facts, Defendant relies on self-serving testimony to deny most incidents occurred. Defendant tries to escape their obligation under the FMLA to take notice of an employee potentially in need of leave by diminishing the gravity of Plaintiff's behavior. Similarly, the evidence shows that Plaintiff was consistently subjected to racially derogatory comments over a number of years. Again, Defendant tries to minimize the scope of harassment to argue the comments were not pervasive, and thus do not constitute a hostile environment. As such, Defendant is asking the Court to invert the summary judgment standard, improperly weigh credibility, and credit their account over that of the Plaintiff. "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Goelzer v. Sheboygan Cty., Wis., 604 F.3d 987, 993–94 (7th Cir. 2010). Consequently, summary judgment must be denied.

## FACTS

Plaintiff, Noemi Valdivia ("Noemi" or "Valdivia") worked for District 214 from May 2010 through August 2016. See Response to Def. Statement of Facts ("Resp.") at ¶¶ 1,12. Through June of 2016, Plaintiff worked at Elk Grove High School ("Elk Grove") in the same office as two other assistants, Denise Heinol ("Heinol") and Judi Miller ("Miller"). See Plaintiff's Statement of Additional Facts ("SOAF") at ¶¶ 1, 3. Plaintiff is Hispanic, emigrated from Mexico with her family, and is bilingual in Spanish and English. Id. at ¶ 2. As a part of her job, Plaintiff spoke Spanish with Hispanic families. Id. at ¶ 3. On occasion, she also spoke Spanish with other Spanish-speaking employees. Id. at ¶ 10.

Throughout her time at Elk Grove, Noemi's coworker, Heinol, regularly and consistently made racially derogatory comments about Hispanic and Mexican people. Id. at ¶¶ 1-2, 9. In June of 2011, Plaintiff complained via chat (a written instant messaging system) with her supervisor at the time, Carmela Sacchitello ("Sacchitello"), that she was extremely upset because her coworker had made a litany of offensive statements to her, including:

- "being sick and tired of [] these Mexicans, Illegal Aliens coming to the United States and not bothering to speak English and wanting everything handed down to them;"
- "before there was a bilingual secretary they would make these Mexicans learn the language and not cater to them;"
- "They just keep having babies because it is all handed down to them;"
- "these damn illegal aliens, Mexican coming here are not even filing taxes and getting paid under the table and still expect all services for free;"
- "She [Heinol] should just move to Mexico since they are all here and probably none left over there."

Id. at ¶ 4. Noemi told Heinol that those comments were not appropriate, she and her family were Mexican immigrants, and that Heinol should not be saying these things. Id. at ¶¶ 4, 12. When Heinol persisted, Noemi walked out of the office. Id. at ¶ 12. Noemi also told her supervisor that this was not the first time Heinol had made these comments. Id. at ¶ 5. Noemi also complained about Heinol's comments to Val Norris, the assistant principal for student services. Id. at ¶ 6. On June 2, 2011, Sacchitello forwarded the conversation to Kyle Burritt, who was the assistant principal and Heinol's supervisor. Id. at ¶ 7. Several years later, on August 31, 2015, Burritt forwarded this same conversation to Paul Kelly, the Principal, and Megan Knight, the assistant to the associate principal of instruction and Noemi's supervisor at the time. Id. at ¶ 8.

These remarks occurred so frequently and for so long that Noemi could not pinpoint when it began or recount each instance that occurred. Id. at ¶¶ 9, 10; Resp. at ¶ 25. Continuing through 2015, Heinol complained about Mexicans as freeloaders who should leave the country and how Defendant catered to Hispanics by having a bilingual secretary (Noemi). Resp. at ¶ 22, SOAF at ¶¶ 9, 13-14. In addition, on two other occasions, while Noemi was conversing with a coworker, Miller told Noemi to stop speaking Spanish because "we're in America." SOAF at ¶ 10. Miller then complained about Noemi speaking Spanish to Kelly. Id. at ¶ 11. Noemi also complained repeatedly to Kelly and Norris that she believed her coworker to be a racist and felt she was working in a hostile environment. Id. at ¶¶ 6, 13. Indeed, two months after Noemi left Elk Grove, Noemi started psychiatric treatment and she told her psychiatrist how stressed she had been working in this hostile environment for so long. Id. at ¶ 32.

In April of 2016, Noemi received a new 12-month position at Wheeling High School ("Wheeling") as the assistant to the Principal, Angela Sisi ("Sisi"). Id. at ¶¶ 17-18. Defendant employs people in 8-month, 10-month, and 12-month positions. Id. at ¶ 17. Sisi was the

daughter of Noemi's prior supervisor, Sacchitello, who endorsed Noemi as the best assistant she had ever had. Id. at ¶ 16. Prior to hiring her, Sisi had interacted with Noemi on multiple occasions at Elk Grove and once at Sacchitello's house. Resp. at ¶ 8. Several other people told Sisi about Noemi's strong reputation. Id. at ¶ 9; SOAF at ¶ 16. Before beginning work, Noemi asked to, arranged, and carried out training with the woman who she was replacing. SOAF at ¶ 19. Noemi was scheduled to start in July of 2016; however, she chose to start early, albeit at a lower rate of pay until July 1. Id. at ¶¶ 18, 20.

Around this same time, in June of 2016, Noemi began feeling extremely overwhelmed. Id. at ¶ 21. She had trouble sleeping, started losing weight, had racing thoughts, and suffered bouts of uncontrollable crying. Id. Her symptoms worsened throughout July. Resp. at ¶ 47. Not long after starting at Wheeling, Noemi began telling Sisi about how she felt. SOAF at ¶ 22. Noemi suddenly applied for a different job, one with less pay and in a less prestigious position. Id. at ¶¶ 15, 23. Noemi continuously agonized to Sisi, crying and telling Sisi how overwhelmed she felt, she did not know what was wrong with her, she was confused, afraid, she had medical issues, and that she did not know what to do. Id. at ¶¶ 22, 24-25. Despite only working with Sisi for a matter of weeks, Noemi repeatedly lamented that she did not want to "abandon" her. Resp. at ¶ 55. At one point, Noemi asked Sisi if there was a 10-month position available. SOAF at ¶ 24. Noemi hoped that, with a ten-month position, the two months off from work would allow her time to figure out what was wrong with her. Id. Ultimately, not knowing what else to do, Noemi submitted her resignation on August 4, 2016 to take a 10-month position at a different school. Id. at 23, Resp. at ¶ 12.

However, on August 9, 2016, at approximately 7:00AM, Noemi showed up at Sisi's home, unannounced. SOAF at ¶ 26. Noemi was crying and told Sisi she wanted to rescind the

resignation. Id. Sisi refused to rescind Noemi's resignation. Id. at ¶ 28. The School Board had to approve her resignation for it to be official, which they did on August 11, 2016. Resp. at ¶ 12.

The following day, on August 12, Plaintiff started a new position at Dundee-Crown. Id. at ¶ 30. Within days, Noemi stopped showing up to work and did not call in. Id. Noemi was hospitalized for four days and medicated for depression and anxiety. Id. at ¶ 31. On August 31, 2016, Plaintiff was diagnosed as suffering from severe major depressive disorder and moderate to severe generalized anxiety disorder and began an ongoing course of treatment. Id. at ¶ 32.

## ARGUMENT

Defendant has predicated its motion upon versions of the facts presented in the light most favorable to them, contrary to the wealth of precedent from the Seventh Circuit and the Supreme Court requiring the opposite: that all facts be viewed in a light most favorable to Valdivia, the non-movant. See Culver v. Gorman & Co., 416 F.3d 540, 545 (7th Cir. 2005) (the evidence of the non-movant "is to be believed, and all justifiable inferences are to be drawn in her favor"). Very recently, the Seventh Circuit reiterated that where (as here) the plaintiff has articulated a narrative of events supported by admissible evidence contradicting the defendant's narrative in response to summary judgment, a defendant cannot simply "insist[] instead on its own version of events. That approach might work in a trial, but it cannot sustain summary judgment." Baines v. Walgreen Co., 863 F.3d 656, 659 (7th Cir. 2017). Because evidence exists to support each element of each of Valdivia's claims when viewed in a light most favorable to *her*, Defendant's motion must be denied. Loudermilk v. Best Pallet Co. *et al.*, 636 F.3d 312 (7th Cir. 2011) (reversing and remanding the district court's grant of summary judgment after concluding that the judge had improperly taken the employer's view of the evidence).

The Seventh Circuit has also expressed frustration with defendants "present[ing] the evidence they'd like a jury to accept, rather than just the evidence that . . . provides a permissible basis for a grant of summary judgment," adding that "such a mode of presentation is unhelpful to the court." Vodak v. City of Chicago, 639 F.3d 738, 740 (7th Cir. 2011). Moreover, it is well established that issues related to disputed facts and credibility are questions for the jury to decide at trial – not for the Court to weigh on summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). "The witnesses on both sides come . . . with their own perceptions, recollections, and even potential biases. It is in part for that reason that genuine disputes are generally resolved by juries in our adversarial system." Tolan v. Cotton, 134 S. Ct. 1861, 1868 (2014) (reversing the lower court's award of summary judgment and reiterating that "[b]y weighing the evidence and reaching factual inferences contrary to [the non-movant's] competent evidence, the court below neglected to adhere to the fundamental principle that at the summary judgment stage, reasonable inferences should be drawn in favor of the non-moving party.").

## I. Triable Issues of Fact Exist for Plaintiff's Hostile Environment Claim

Subjected to several years of racial derision, Valdivia suffered a hostile environment as prohibited by Title VII. Title VII prohibits "employers from requiring people to work in a discriminatorily hostile or abusive environment." Boss v. Castro, 816 F.3d 910, 920 (7th Cir. 2016) (*internal citations omitted*). To prevail in a Title VII hostile environment claim, a plaintiff must show that: (1) she was subject to unwelcome harassment; (2) the harassment was based on her race; (3) the harassment was severe or pervasive so as to alter the conditions of employment and create a hostile or abusive working environment; and (4) there is basis for employer liability. Huri v. Office of the Chief Judge of the Circuit Court of Cook Cty., 804 F.3d 826, 833-34 (7th Cir. 2015). Defendant argues that Valdivia cannot establish that the harassment she experienced

and reported was severe or pervasive enough to rise to the level of a hostile environment. Yet, as Defendant notes, "Courts should not carve up the incidents of harassment and then separately analyze each incident, by itself, to see if each rises to the level of being severe or pervasive." Nichols v. Michigan Cty. Planning Dept., 755 F.3d 594, 601 (7th Cir. 2014) (*internal citations omitted*.) Rather, "a series of less severe acts" may create a hostile environment in violation of Title VII. Hall v. City of Chicago, 713 F.3d 325, 330 (7th Cir. 2013). Whether an environment is hostile "can be determined only by looking at all the circumstances." Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993). Circumstances may include the frequency of the discriminatory conduct, severity, whether it unreasonably interferes with an employee's work performance, and/or its effect on the employee's psychological well-being. Id. Any relevant factor may be taken into account – no single factor is required. Id.

Here, the record shows that Valdivia was subjected to (and reported) consistent racially derogatory remarks over a period of several years, the cumulative effect of which created a hostile work environment. Beginning in at least 2011, through 2016, Valdivia's coworkers regularly complained about and disparaged Hispanic, and particularly Mexican, families. (SOAF ¶¶ 4-6, 9-10.) Valdivia, without dispute, is Hispanic and thus found this ongoing ridicule extremely upsetting, stressful, and offensive. (Id. ¶ 4, 31.) Documentary evidence shows that, in June of 2011, Noemi was so upset by her coworker's statements that she complained to two members of the District 214 leadership. (Id. ¶¶ 4-6). Valdivia was distressed over her coworker's tirade about how "she is sick and tired of these illegal aliens coming to the United States and expecting everything to be done for them and getting all of the services for free...that back before there was a bilingual secretary they would make these make these Mexicans learn the language and not cater to them... They just keep having babies because it is all handed down to them..."

Ex. 2 at p. 2 to Def. Ex. H. Valdivia was the bilingual secretary 'catering' to Mexican families by speaking Spanish with them. Despite this being reported to multiple supervisors in 2011 in to 2015, the racially derogatory commentary continued, and Defendant failed to take any action to correct or prevent it. (SOAF ¶¶ 4-10, 13.) Plaintiff recounted two occasions when she was told "not to speak Spanish, we're in America." (Id. ¶ 10). Indeed, Valdivia's coworker lodged a complaint against her with Principal Kelly for speaking Spanish. (Id. ¶ 11.) Plaintiff also testified how, in 2015, Heinol talked about how hoped Trump would win the election in order to put a stop to, and get rid of, the Latinos taking advantage of the system. (Resp. at ¶ 23.) See Def. Ex. A, Valdivia Dep. at 57:20-24, 58:1-22. Noemi also testified about the same coworker complaining about Latinos who have "their nails done and they have new cell phones and yet they're applying for fee waivers." Id. at 69:16-18.

Thus, contrary to Defendant's self-serving assertion, Plaintiff introduced evidence of multiple instances of specific racially derogatory comments, occurring consistently over the course of years – not merely a stray comment. Based on the evidence already in the record, a jury could reasonably conclude that Valdivia was subjected to a hostile work environment. Indeed, as the bilingual secretary in the office, many of these comments were, in fact, directed toward her. Additionally, the two times she was told not to speak Spanish were directed to her. Furthermore, even if her coworker had not initially directed these statements at Plaintiff, Noemi repeatedly told Heinol that she was Mexican, the statements were inappropriate, and that she was offended. A jury can reasonably infer that, after repeatedly being put on notice that her statements were hurtful and offensive, Heinol persisted in saying such things in order to directly antagonize Valdivia. A reasonable jury could also conclude, based on the evidence, that the Defendant's repeated failure to take any action to prevent this kind of conduct in the workplace

(i.e., its tolerance of the behavior) contributed to the hostility of the environment for Valdivia. See Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 115 (2002).

Hostile environment claims premised upon pervasiveness, by their nature, "cannot be said to occur on any particular day. It occurs over a series of days or perhaps years... Such claims are based on the cumulative effect of individual acts." Id. Plaintiff testified that she heard such racially derogatory statements so frequently, and for such an extended duration, that she could not recall them all or pinpoint their beginning. Statements that are not time-and-date-stamped must still be credited for purposes of summary judgment. See Pagel v. TIN Inc., 685 F.3d 622, 628 (7th Cir. 2012) (finding that plaintiff's testimony that his memory was fuzzy, in conjunction with certain specific accounts, was sufficient to create a triable issue of fact).

"When the workplace is permeated with 'discriminatory intimidation, ridicule, and insult,' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment,' Title VII is violated." Nat'l R.R., 536 U.S. at 116 (*internal citations omitted*.) Noemi testified that she was upset and offended by her coworkers' racially derogatory statements, and repeatedly tried to make the comments stop or was forced to walk out of the office to get away from the situation. (SOAF ¶¶ 4, 9, 12.) She complained repeatedly, to multiple supervisors, over several years. (Id. ¶¶ 4, 6, 13.) In due course, she informed her psychiatrist how much stress she had suffered as a result of this racially hostile environment. (Id. ¶ 32.) Whether a jury ultimately rules in favor of Plaintiff is irrelevant. At this stage, what matters is that a jury can reasonably find that five years of consistent racial attacks is sufficiently pervasive as to constitute a hostile environment and violate Noemi's Title VII rights.

## II. Genuine Issues of Fact Remain for Plaintiff's FMLA Interference Claim

To prevail on an FMLA interference claim, the plaintiff must prove that: "(1) she was eligible for the FMLA's protections; (2) her employer was covered by the FMLA; (3) she was entitled to take leave under the FMLA; (4) she provided sufficient notice of her intent to take leave; and (5) her employer denied her FMLA benefits to which she was entitled." Pagel, 695 F.3d at 627 (*internal citations omitted*). Here, Defendant only challenges the fourth prong, arguing that Plaintiff failed to provide sufficient notice. Defendant is attempting to re-litigate FMLA standards for employee notice. As in its Motion to Dismiss (D.E. 31), Defendant hyperbolically claims that it is being asked to play doctor. No one expects an employer to diagnose medical conditions, and that is not what Plaintiff faults Defendant for failing to do here. But what employers *are* expected do under the FMLA is to identify when somebody is acting outside the norm of expected behavior and give that person the opportunity to see a doctor who can make any necessary diagnosis. See Byrne v. Avon Prod., Inc., 328 F.3d 379, 381 (7th Cir. 2003). Contrary to Defendant's contentions, and as this Court has already found (D.E. 37), it is not an "absurd premise" for an employer to recognize that an employee may be in need of FMLA leave even when the employee does not directly request it, and even prior to diagnosis. See Burnett v. LFW Inc., 472 F.3d 471, 481 (7th Cir. 2006) ("it is entirely appropriate under the FMLA for an employee to give accumulating information about a medical condition as it evolves.") Similar to the ADA's requirement that employers engage in interactive process to accommodate employees, the FMLA is one of the very few employment statutes that impose an affirmative obligation on employers to take action when it is objectively apparent that something could be wrong.

Congress designed the FMLA to include protections for employees such as Valdivia – employees who, due to their serious health condition, are not able to identify and articulate what exactly is wrong with them. See Byrne, 328 F.3d 379. An employee is required to give notice of the need for leave, "*except in extraordinary circumstances where such notice is not feasible*." Id. at 382 (*emphasis in original*.) "[T]he notice inquiry is a "fact-rich question ... perhaps best resolved by the trier of fact, particularly, where, as is the case here, the employer and employee dispute the quantity and nature of communications regarding the employee's illness." Pagel, 695 F.3d at 628 (*internal citations omitted*). See also Lichtenstein v. Univ. of Pittsburgh Med. Ctr., 691 F.3d 294, 303–04 (3d Cir. 2012) (noting that the "critical test" in determining the sufficiency of notice is "how the information conveyed to the employer is reasonably interpreted," which is generally a question of fact) (*internal quotations and citations omitted*). In assessing the sufficiency of notice, an employee's comments and actions must be placed in their proper context. See Burnett, 472 F.3d at 480–81. An employer must pay attention to all of the information it receives from an employee, and cannot treat each statement or action as though it exists in a vacuum. Id. The notice requirement is fulfilled where the progression of information would provide a reasonable employer with notice of a potential need for leave. Id. Further, an employee may satisfy the notice requirement through "unusual behavior," on the grounds that such behavior is "itself notice that something [has] gone medically wrong." Byrne, 328 F.3d at 381 (*emphasis in original*). Indeed, constructive notice to an employer may precede a diagnosis. See Stevenson v. Hyre Elec. Co., 505 F.3d at 721, 723, 726 (holding that plaintiff could establish notice prior to diagnosis based on her behavior); Burnett, 472 F.3d at 477 (reversing summary judgment for employer on the question of notice where employee was terminated before diagnosis). If a trier of fact believes *either* (a) that the change in behavior was enough to notify a

reasonable employer that Valdivia suffered from a serious health condition, *or* (b) that Valdivia was mentally unable either to work or give notice, then the notice requirement would be satisfied and she would be entitled to the protections of the FMLA. See Byrne, 328 F.3d at 382.

In Byrne, the Seventh Circuit held that "a dramatic change in behavior" may serve as notice of a medical problem. 328 F.3d at 381. The plaintiff in Byrne, who had a previously unblemished performance record, suddenly began sleeping and reading for long stretches while on duty, left work early, and did not appear for a meeting to discuss these changes in his behavior. Id. at 380. Byrne was suffering from major depression, his employer was not aware of this fact until after his termination, but subsequently refused to return him to his position even after learning of the diagnosis. Id. The court found that a trier of fact would be entitled to conclude that plaintiff's change in behavior prior to his termination sufficed to notify the employer that he was suffering from a serious health condition or, alternatively, that he was excused from giving notice because his condition rendered him unable to do so. Id. at 382. In either case, the court found, the plaintiff was entitled to FMLA leave and reinstatement, despite not having explicitly communicated the fact or gravity of his illness to his employer. See id.

Similar to Byrne, Valdivia had been a model employee whose spiraling behavior stemmed from her as-yet undiagnosed severe major depressive disorder and moderate to severe anxiety disorder. Here, Defendant persists in claiming that Principal Sisi never saw Noemi acting unusually (other than showing up to Sisi's house unannounced at 7AM to beg to rescind her resignation). Sisi denies seeing Noemi crying profusely on multiple occasions, but does concede that she saw Plaintiff's eyes fill with tears and that she saw Noemi become emotional. (Resp. ¶¶ 53-5.) Plaintiff testified repeatedly and consistently that she cried profusely in front of Sisi on multiple occasions. (SOAF ¶¶ 22, 26.) Valdivia told Sisi repeatedly how she felt

overwhelmed, had trouble sleeping, did not know what was wrong with her, and needed to leave for "medical issues." (Id. ¶¶ 22, 25.) Before resigning, Noemi also asked Sisi about transferring to a ten-month position in the hope that two months off of work would allow her to figure out what was wrong. (Id. ¶ 24.) It is worth noting that the FMLA provides for up to 12 weeks of leave, which, of course, would have covered the two months, i.e. eight weeks Plaintiff sought.

Documentary evidence and Sisi's testimony show that Valdivia came highly recommended from multiple sources and had been stably employed in the same position for six years. (Id. ¶ 16.) Plaintiff's new position was highly respected. (Id. ¶ 15.) Of her own volition, Noemi asked to come to Wheeling to train with the retiring employee she was replacing, and also elected to start her new job early – at a lower rate of pay. (Id. ¶ 19-20.) Yet, suddenly, at the same time that Sisi observed Noemi showing physical signs of distress, sadness, confusion, and lethargy, Noemi applied for another job with less pay and less prestige, and then discussed the possibility of quitting her new job with her new boss ad nauseum. (Resp. ¶¶ 54-6.) According to Sisi, Noemi appeared extremely indecisive and repeatedly lamented her fears of "abandoning" Sisi – her boss for all of 4 weeks. (Id. ¶¶ 15, 55.)

Valdivia's behavior cannot be viewed in a vacuum. See Burnett, 472 F.3d at 480–81. Defendant claims that Sisi could not interpret Noemi's behavior as strange because they did not know each other well. However, this notion ignores that Defendant – and Sisi – had sufficient institutional knowledge about Valdivia to draw upon. See id. at 481. Sisi was aware of Valdivia's unblemished record and length of service. Taken together, a jury could reasonably conclude that Defendant had constructive notice that Valdivia might have a serious health condition by considering: Noemi's repeated fits of crying; suddenly throwing away a promotion; obsessively discussing leaving her new job with her new boss; obsessing over whether she was

'abandoning' a woman she'd worked with for only a matter of weeks; telling Sisi she was overwhelmed and confused, something was wrong with her, she was having trouble sleeping, and she believed she had medical issues; and/or asking for a ten-month position so she could have two months to figure out what was wrong. In addition, a jury could reasonably conclude that Valdivia showing up, unannounced, at Sisi's home at 7AM was sufficiently unusual behavior to put Defendant on notice that Valdivia might have an FMLA-qualifying condition. See Williams v. Illinois Dep't of Corr., No. 05-CV-4227-JPG, 2007 WL 2316473 (S.D. Ill. Aug. 13, 2007) (denying motion for judgment as a matter of law on FMLA interference claim where plaintiff resigned because he did not know his FMLA rights and then employer failed to remedy the harm by allowing him to rescind his resignation and take FMLA leave).

Furthermore, Defendant's claim that Valdivia knew her rights well enough that she could, and should, have requested leave is a red herring and irrelevant. "[T]he employee can be completely ignorant of the benefits conferred by the Act: it is sufficient notice if the employee provides the employer with enough information to put the employer on notice that FMLA-qualifying leave is needed." Stoops v. One Call Commc'ns, Inc., 141 F.3d 309, 312 (7th Cir. 1998). Noemi did not understand the breadth of the FMLA, but believed it only covered maternity leave. See Def. Ex. A, Valdivia Dep. at 86:12-22, 88:2-16, 97:9-20, 98:1-12. It is important to note that Valdivia was not alone in that assumption. In fact, the real problem occurred because Principal Sisi, herself, believed that the FMLA pertained only to maternity leave at the time Valdivia resigned. (SOAF ¶ 27.) Only *after* this lawsuit was filed did Sisi learn that the FMLA covers a wide array of serious health conditions, including mental health. (Id.) It is remarkable that Defendant argues Valdivia should have fully comprehended her rights and

responsibilities under the FMLA when Sisi, a Principal with nearly 20 years of experience actually handling FMLA requests, was unaware of the statutory obligations or qualifying events.

Additionally, "an employee may be excused from giving notice where [her] medical condition (e.g., clinical depression) prevents [her] from communicating the nature of [her] illness and resulting need for medical leave." Burnett, 472 F.3d at 479. Here, a trier of fact could also reasonably conclude that Noemi's onset of severe major depressive disorder and moderate to severe generalized anxiety disorder rendered her unable to work and incapable of providing notice. See Byrne, 328 F.3d at 382. Indeed, within days of submitting then attempting to rescind her resignation, Noemi ceased working, was hospitalized for four days, and was medicated. (SOAF ¶¶ 30-32.) Symptoms of a major depressive episode such as Noemi experienced include a "tendency to become more reactive" and as "the depression gets worse and worse, people become more quite reactive, and they don't care about the consequences." Pltf Ex. 6, Waliuddin Dep. at 32:13-18. Therefore, a jury would be entitled to conclude that Valdivia was excused from giving notice because her medical condition rendered her incapable.

## CONCLUSION

After considering the entirety of the record, "[i]n short, we are left with two competing accounts, either of which a jury could believe." Goelzer, 604 F.3d at 995. Consequently, Defendant's motion for summary judgment must be denied.

Dated: January 29, 2018

Respectfully submitted,
NOEMI VALDIVIA,

By: /s/ Alexis D. Martin
One of Plaintiff's attorneys

Alejandro Caffarelli, #06239078
Alexis D. Martin, #06309619
Madeline K. Engel, #06303249
Caffarelli & Associates Ltd.
224 N. Michigan Ave., Suite 300
Chicago, Illinois 60604
Tel. (312) 763-6880

## CERTIFICATE OF SERVICE

The undersigned, an attorney, hereby certifies that a copy of the attached, **Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment**, was served upon the parties below by electronically filing with the Clerk of the U.S. District Court of the Northern District of Illinois on January 29, 2018.

Michael E. Kujawa (mkujawa@schainbanks.com)
Deborah A. Ostvig (dostvig@schainbanks.com)
Schain, Banks, Kenny & Schwartz, Ltd.
70 West Madison Street, Suite 5300
Chicago, Illinois 60602

/s/ Alexis D. Martin
Attorney for Plaintiff