# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| NOEMI VALDIVIA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) No. 16 C 10333 |
| v. | ) |
| | ) Magistrate Judge Sidney I. Schenkier |
| TOWNSHIP HIGH SCHOOL | ) |
| DISTRICT 214, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER[1]

Plaintiff, Noemi Valdivia, filed a two-count first amended complaint ("complaint") against defendant Township High School District 214 ("District 214" or defendant) seeking damages and injunctive relief on the grounds that defendant subjected her to a racially offensive and hostile work environment, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* ("Title VII"), and interfered with her right to take job-protected leave, in violation of the Family and Medical Leave Act of 1993, 29 U.S.C. § 2601, *et seq.* ("FMLA") (doc. # 29: Compl., at ¶¶ 49-58). On May 15, 2017, after briefing by the parties, this Court denied defendant's motion to dismiss. *Valdivia v. Twp. High Sch. Dist. 214*, No. 16 C 10333, 2017 WL 2114965, at *5 (N.D. Ill. May 15, 2017). Subsequently, defendant answered the complaint, and the parties engaged in discovery. After completion of discovery, defendant moved for summary judgment (doc. # 58). For the reasons set forth below, the Court grants defendant's motion for summary judgment as to plaintiff's Title VII claim, but denies the motion as to plaintiff's FMLA claim.

---

[1]On January 19, 2017, by consent of the parties and pursuant to 28 U.S.C. § 636(c) and Local Rule 73.1, this case was assigned to this Court for all proceedings, including entry of final judgment (doc. # 18).

# I.

The legal standards governing motions for summary judgment are well-established. Summary judgment is appropriate where the moving party establishes that there is no genuine issue as to any material fact and he or she is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A genuine issue exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The substantive law identifies which facts are material. *Zaya v. Sood*, 836 F.3d 800, 804 (7th Cir. 2016).

In deciding a motion for summary judgment, we construe the facts and draw reasonable inferences in the light most favorable to the nonmoving party. *Sommerfield v. City of Chicago*, 863 F.3d 645, 649 (7th Cir. 2017). However, "we need not draw inferences that are supported by only speculation and conjecture." *Woods v. City of Berwyn*, 803 F.3d 865, 869 (7th Cir. 2015); *See also Aguilar v. Gaston-Camara*, 861 F.3d 626, 630-31 (7th Cir. 2017). "[T]he non-movant must 'go beyond the pleadings (*e.g.*, produce affidavits, depositions, answers to interrogatories, or admissions on file), to demonstrate that there is evidence upon which a jury could properly proceed to find a verdict in her favor.'" *Sterk v. Redbox Automated Retail, LLC*, 770 F.3d 618, 627 (7th Cir. 2014) (quoting *Modrowski v. Pigatto*, 712 F.3d 1166, 1169 (7th Cir. 2013)). In other words, the non-moving party "must do more than raise some metaphysical doubt as to the material facts; [it] must come forward with specific facts showing that there is a genuine issue for trial." *Citizens for Appropriate Rural Roads v. Foxx*, 815 F.3d 1068, 1074 (7th Cir. 2016). At this stage, "[t]he parties are required to put their evidentiary cards on the table . . . . Summary judgment is not a time to be coy . . ." *Sommerfield*, 863 F.3d at 649 (internal citations and quotations omitted).

## II.

In support of its motion for summary judgment, defendant submitted a Local Rule 56.1 statement of material facts (doc. # 58: DSOF).[2] Plaintiff responded to defendant's statement of material facts (doc. # 60: Pl.'s Resp. to DSOF, pp. 1-19), and filed a Rule 56.1(b)(3)(C) statement of additional facts (doc. # 60: PSOF, pp. 19-24), to which defendant responded (doc. # 63: Def.'s Resp. to PSOF). The following facts are undisputed unless otherwise indicated.

Ms. Valdivia emigrated from Mexico as a child (Def.'s Resp. to PSOF, ¶ 2). In May 2010, she began working at Elk Grove High School ("Elk Grove") in District 214 (Pl.'s Resp. to DSOF, ¶ 1). Ms. Valdivia worked as an assistant to the associate principal of instruction (*Id.*), and served as a bilingual support staff member; in that capacity, she spoke Spanish with some of the school's Hispanic families (Def.'s Resp. to PSOF, ¶ 3). During the 2010-2011 school year, the associate principal of instruction position was split between Carmela Sacchitello and Janet Reed (DSOF, Ex. A: Valdivia Dep. at 28-30). Nancy Holman was the principal at Elk Grove, and the associate principal of operations was Kyle Burritt (*Id.*). Ms. Valdivia worked in the same office as Diane Free (Ms. Holman's assistant) and Denise Heinol (Mr. Burritt's assistant) (*Id.* at 31; Def.'s Resp. to PSOF, ¶ 1).

On June 1, 2011, plaintiff complained in writing (by text message) to Ms. Sacchitello about racially derogatory remarks Ms. Heinol allegedly made about Latino families (Def.'s Resp. to PSOF, ¶ 4). In the text to Ms. Sacchitello, Ms. Valdivia wrote that Ms. Heinol's remarks included, among other things, that she was sick and tired of Mexicans or illegal aliens coming to the United States because they: do not speak English, want and expect everything to be handed to them for free, get to have a bilingual secretary instead of having to learn English for

---

[2]Defendant filed its DSOF in the same document as its motion for summary judgment, beginning on page two of the document (doc. # 58).

3

themselves, keep having babies because everything is handed to them, and do not file tax returns and get paid under the table (DSOF, Ex. H: Kelly Dep., Ex. 2: June 2011 text). Ms. Valdivia requested that Ms. Sacchitello ask Mr. Burritt not to "bring the racist thing up to Nancy [Holman]. We all need to survive with the way things are currently. She [Ms. Heinol] just needs to be told to relax her attitude" (*Id.*). On June 2, 2011, Ms. Sacchitello emailed the text conversation to Mr. Burritt (Def.'s Resp. to PSOF, ¶ 7). That year, plaintiff also complained to Ms. Reed or Ms. Sacchitello that Ms. Heinol stated that District 214 was catering to its Latino families by hiring a bilingual secretary (Pl.'s Resp. to DSOF, ¶ 24).

Glen Simon replaced Ms. Reed and Ms. Sacchitello as associate principal of instruction for the 2012-2013 school year (Valdivia Dep. at 43). Ms. Valdivia does not recall if she complained to Mr. Simon that her co-workers made racist comments (*Id.* at 46). In the summer of 2013, Paul Kelly replaced Ms. Holman as principal at Elk Grove, and Judi Miller took over the position as assistant to the principal (*Id.* at 31, 45, 49; Kelly Dep. at 14-16). In 2014, Megan Knight replaced Mr. Simon as associate principal of instruction (Valdivia Dep. at 104).

Ms. Valdivia alleges that Ms. Heinol continued to make derogatory comments about Latino families, including in 2015, when she stated that she hoped Donald Trump won the election and ended illegal immigration (Pl.'s Resp. to DSOF, ¶ 23). Plaintiff also claims that Ms. Miller twice told her to stop speaking Spanish because they were in America (Def.'s Resp. to PSOF, ¶ 10). At some point, Ms. Valdivia complained to Valerie Norris, the Assistant Principal of Student Services at Elk Grove,[3] about her office-mates' comments, work habits and work distribution; Ms. Valdivia also told Ms. Norris that she thought Ms. Heinol was a racist (Pl.'s Resp. to DSOF, ¶¶ 36, 39).

---

[3] Ms. Norris worked in a separate office and was not Ms. Valdivia's direct supervisor (DSOF, Ex. I: Norris Dep. at 11).

4

In 2015, plaintiff complained to Mr. Kelly that her co-worker made derogatory comments about Latinos, Mexicans and illegal immigration (Pl.'s Resp. to DSOF, ¶¶ 23, 26). On August 31, 2015, Mr. Burritt sent the 2011 chat conversation between Ms. Sacchitello and Ms. Valdivia to Mr. Kelly and Ms. Knight (Def.'s Resp. to PSOF, ¶ 8). Plaintiff cannot recall how many times her co-workers made derogatory comments about Latinos but she asserts that they did so frequently (Pl.'s Resp. to DSOF, ¶ 25). Mr. Kelly recalls Ms. Valdivia complaining to him about interoffice disputes with Ms. Miller and Ms. Heinol, but he does not recall that Ms. Valdivia ever complained that they made racist or harassing comments (*Id.*, ¶¶ 29-32).

While at Elk Grove, Ms. Valdivia received positive annual reviews and never received any discipline or reprimands (Pl.'s Resp. to DSOF, ¶ 3). In March 2016, she applied for a position as assistant to the principal -- Angela Sisi -- at District 214's Wheeling High School ("Wheeling"); this job offered more pay and prestige than Ms. Valdivia's Elk Grove position (Def.'s Resp. to PSOF, ¶¶ 14- 15). Ms. Sisi is the daughter of Ms. Sacchitello; Ms. Sacchitello recommended Ms. Valdivia as the best assistant she had ever had (*Id.*, ¶ 16). Ms. Sisi first met plaintiff at Ms. Sacchitello's home in 2011, and they had bumped into each other about five times at Elk Grove (Pl.'s Resp. to DSOF, ¶ 8). In April 2016, Wheeling hired Ms. Valdivia for a 12-month position, which Ms. Valdivia began in mid-June 2016 (Def.'s Resp. to PSOF, ¶¶ 17-20). Plaintiff did not discuss problems she had at Elk Grove with anyone at Wheeling (Pl.'s Resp. to DSOF, ¶ 41).

In June 2016, Ms. Valdivia asserts that she began to feel overwhelmed and experienced racing thoughts, obsessive worrying, anxiety, insomnia and loss of appetite (Def.'s Resp. to PSOF, ¶ 21). Ms. Valdivia had never received mental health treatment, and she did not understand what was happening to her (Pl.'s Resp. to DSOF, ¶¶ 48-49).

On July 14, 2016, Ms. Valdivia applied for a job closer to her home, with School District 300; she was offered the position, and she accepted on or before July 27, 2016 (Pl.'s Resp. to DSOF, ¶¶ 16-17, 50). Ms. Valdivia was emotional when she discussed her decision to leave District 214 with Ms. Sisi; Ms. Valdivia told Ms. Sisi that she had not been sleeping and she was worried about her career and about leaving Ms. Sisi (*Id.*, ¶ 54). Ms. Valdivia asserts that she cried in front of Ms. Sisi and experienced crying fits at work, but defendant disputes this (Def.'s Resp. to PSOF, ¶¶ 21-22; Pl.'s Resp. to DSOF, ¶ 53). On August 4, 2016, Ms. Valdivia submitted her letter of resignation to Ms. Sisi; Ms. Valdivia asserts that she was crying when she did so, but defendant disputes this, acknowledging only that Ms. Valdivia was "emotional" (*Id.*; Pl.'s Resp. to DSOF, ¶¶ 55-57). Ms. Valdivia told Ms. Sisi she was going to take the District 300 job at least partly because it was closer to her home (*Id.*, ¶ 58).

On August 9, 2016, Ms. Valdivia showed up unannounced at Ms. Sisi's home at 7:00 a.m., asking to rescind her resignation from Wheeling (Def.'s Resp. to PSOF, ¶ 26). Ms. Valdivia asserts that she was crying, but defendant disputes this (*Id.*). Ms. Sisi did not allow Ms. Valdivia to rescind her resignation, and the District 214 school board accepted Ms. Valdivia's resignation on August 11, 2016 (*Id.*, ¶ 28; Pl.'s Resp. to DSOF, ¶ 12). Ms. Sisi never discussed FMLA leave with plaintiff (Pl.'s Resp. to DSOF, ¶ 59).

Ms. Valdivia started work for District 300 on August 12, 2016; she had completed her employee physical for District 300 on August 5, 2016, which indicated she had no work restrictions (Pl.'s Resp. to DSOF, ¶¶ 18-20). On August 20, 2016, plaintiff was hospitalized for four days and given medication for severe depression and anxiety, and treated for her inability to sleep (Def.'s Resp. to PSOF, ¶ 31). She began seeing a psychiatrist on August 31, 2016, who

diagnosed her with severe major depressive disorder and moderate to severe generalized anxiety disorder (*Id.*, ¶¶ 32-33).

### III.

Defendant contends that this Court should grant summary judgment in its favor because Ms. Valdivia has not raised a genuine issue as to any fact material to her hostile work environment and FMLA claims. We first address plaintiff's hostile work environment claim.

In the complaint, Ms. Valdivia alleged that defendant "knowingly and continually subjected [her] to a racially offensive and hostile work environment" on the basis of her Hispanic race, in violation of Title VII (Compl., ¶¶ 51-53). Title VII prohibits "employers from requiring people to work in a discriminatorily hostile or abusive environment." *Boss*, 816 F.3d at 920. "To survive summary judgment on a racially hostile work environment claim, an employee must provide sufficient evidence that demonstrates: (1) that the work environment was both subjectively and objectively offensive; (2) that the harassment was based on membership in a protected class; (3) that the conduct was severe or pervasive; and (4) that there is a basis for employer liability." *Nichols v. Michigan City Plant Planning Dep't*, 755 F.3d 594, 600 (7th Cir. 2014). "If there is no triable issue of fact on even one essential element of the nonmovant's case, summary judgment is appropriate." *Boss*, 816 F.3d at 916.

District 214 argues that Ms. Valdivia has failed to provide sufficient evidence that she was subjected to actionable conduct that was severe or pervasive (doc. # 59: Def.'s Mem. in Supp. of Summ. J. at 7). In its briefing, defendant erroneously states on several occasions that plaintiff must establish that the alleged conduct was "severe *and* pervasive" (*Id.* (emphasis added)). Defendant made this same error in briefing its motion to dismiss. As we explained in our earlier opinion, "[t]his is the wrong standard. This element of a hostile work environment

claim 'is in the disjunctive – the conduct must be either severe or pervasive. This means that one extremely serious act of harassment could rise to an actionable level as could a series of less severe acts.'" *Valdivia*, 2017 WL 2114965, at *3 (quoting *Hall v. City of Chicago*, 713 F.3d 325, 330 (7th Cir. 2013)). "[P]ervasiveness and severity are, to a certain degree, inversely related; a sufficiently severe episode may occur as rarely as once, while a relentless pattern of lesser harassment that extends over a long period of time also violates the statute." *Cerros v. Steel Techs., Inc.*, 398 F.3d 944, 951 (7th Cir. 2005) (internal quotations omitted). "[W]hile there is no magic number of slurs that indicates a hostile work environment, an unambiguously racial epithet falls on the more severe end of the spectrum." *Nichols*, 755 F.3d at 601 (internal quotations omitted).

Under either the severe or pervasive standard, "[t]he key inquiry is whether the conduct . . . altered the conditions of the employment relationship. In determining whether the conduct is sufficiently severe or pervasive to be actionable, we look at the totality of the circumstances, including: (1) the frequency of the discriminatory conduct; (2) how offensive a reasonable person would deem it to be; (3) whether it is physically threatening or humiliating conduct as opposed to verbal abuse; (4) whether it unreasonably interferes with an employee's work performance; and (5) whether it was directed at the victim." *Nichols*, 755 F.3d at 601.

Construing the facts and drawing all reasonable inferences in her favor for summary judgment purposes, Ms. Valdivia has established (by way of her own deposition) that during the six years they worked in the same office, Ms. Heinol stated multiple times -- in the presence of Ms. Valdivia or to her -- that she was sick and tired of Mexicans or illegal aliens coming to the United States because they: do not speak English, want and expect everything to be handed to them for free, get to have a bilingual secretary instead of having to learn English for themselves,

8

keep having babies because everything is handed to them, and do not file tax returns and get paid under the table. Ms. Heinol also voiced support for Mr. Trump and his desire to end illegal immigration. In addition, Ms. Miller at least twice told Ms. Valdivia to stop speaking Spanish because they were in America.[4]

However, that evidence is not adequate to allow a reasonable jury to find that the conduct of which Ms. Valdivia complains was sufficiently severe or pervasive to be actionable. Below, we address the factors, and the evidence, relevant to our determination.

### A.

Regarding the frequency of the alleged discriminatory conduct, Ms. Valdivia contends that over several years, she heard Ms. Heinol -- and, to a lesser extent, Ms. Miller -- "consistently," "frequently" and "regularly" make derogatory comments about Latinos and illegal immigrants (doc. # 61: Pl.'s Resp. at 1-3, 7). However, this contention "provides no detail on the regularity [of the conduct] and so we cannot consider the few comments detailed in the briefs to be pervasive." *Ezell v. Potter*, 400 F.3d 1041, 1048 (7th Cir. 2005) (noting that "a regular basis could be daily, weekly, monthly or even yearly"). "[V]ague and conclusory allegations of being 'harassed' and 'intimidated' by her supervisors . . . without more detail" do not present a triable issue as to whether the complained-of conduct was objectively offensive, severe, or pervasive. *Porter v. City of Chicago*, 700 F.3d 944, 956 (7th Cir. 2012).

Ms. Valdivia asserts that she has adequately supported her claim that the conduct occurred consistently, frequently and regularly with "evidence of multiple instances of specific racially derogatory comments" (Pl.'s Resp. at 8). However, Ms. Valdivia only specifically recalled a few instances of the alleged harassing conduct, and besides an example from 2011,

---

[4]Ms. Valdivia states that in July 2016, she also heard Angela Ginnan, Associate Principal of Operations at Wheeling, make a derogatory comment about a Hispanic family that "those people never paid their bills" (Pl.'s Resp. to DSOF, ¶¶ 42-45). Plaintiff did not report this comment to anyone (*Id.*, ¶ 46).

9

Ms. Valdivia's examples are not at all specific. Ms. Valdivia recalled that: in 2011, she complained of Ms. Heinol's conduct in a text message to Ms. Sacchitello; in 2015, she verbally complained to Mr. Kelly about her co-worker's comments; also in 2015, her co-workers expressed hope that Donald Trump would win the election and end illegal immigration; at some undefined point after 2013, when Ms. Miller began working in the office, she twice told Ms. Valdivia to stop speaking Spanish; and at another unspecified time or times, Ms. Valdivia told Ms. Norris that she thought Ms. Heinol was a racist.

Ms. Valdivia's general recollections of alleged discriminatory conduct are not sufficient to raise a triable issue of fact that she was subjected to such frequent discriminatory conduct that it could be considered pervasive. The Seventh Circuit has described the pervasiveness standard as "a concentrated or incessant barrage" of conduct. *Whittaker v. N. Ill. Univ.*, 424 F.3d 640, 646 (7th Cir. 2005). "[R]elatively isolated instances of non-severe misconduct will not support a claim of a hostile environment." *Id. See also Mannie v. Potter*, 394 F.3d 977, 983 (7th Cir. 2005) (affirming summary judgment where "[m]ost of the conduct that forms the basis of [the plaintiff's] claim consists of derogatory statements made by supervisors or co-workers out of her hearing," and the rest was "isolated and not particularly severe"); *Compare Jackson v. Cty. of Racine*, 474 F.3d 493, 499-500 (7th Cir. 2007) (holding that while alleged conduct was not particularly severe, it could be considered "pervasive enough and corrosive enough" to meet the standard for liability where the plaintiff provided evidence that her supervisor engaged in harassing conduct on a daily basis).

The evidence Ms. Valdivia provides does not support a finding of pervasive conduct. She recalls only "[a] handful of comments" spread over six years, including a gap in the evidence of three to four years within that, which is the kind of conduct the Seventh Circuit has found is

insufficient to sustain a hostile work environment claim. *Whittaker*, 424 F.3d at 646; *see also Malekpour v. Chao*, 682 Fed. App'x 471, 475 (7th Cir. 2017) (affirming the district court's determination that the alleged discriminatory incidents did not evidence a hostile work environment because they were "infrequent (the district court noted that they were spaced out over six years) and were not so hostile as to alter the conditions of the victim's employment and create an abusive working environment"); *Patt v. Family Health Sys., Inc.*, 280 F.3d 749, 754 (7th Cir. 2002) (holding that eight offensive gender-based comments made to the plaintiff during her multi-year employment with the defendant "were too isolated and sporadic to constitute severe or pervasive harassment").

The other conduct that Ms. Valdivia asserts is too vague and unspecific to allow a jury to evaluate its severity or pervasiveness. *See Lucas v. Chicago Transit Auth.*, 367 F.3d 714, 726 (7th Cir. 2004) (holding that general examples that African-American employees were treated "more harshly" was not sufficient to avoid summary judgment where the plaintiff did not set forth "any of the times, dates or places which led to these conclusions"); and *Gabrielle M. v. Park Forest-Chicago Heights, IL. Sch. Dist. 163*, 315 F.3d 817, 822 (7th Cir. 2003) (affirming grant of summary judgment in Title IX case because the plaintiff had failed to specify the "when, where, or how often" the alleged conduct occurred). In sum, the lack of specific evidence showing the frequency of the alleged discriminatory conduct undermines Ms. Valdivia's claim that the alleged conduct was severe or pervasive.

**B.**

We next consider how offensive a reasonable person would deem the alleged conduct. *Nichols*, 755 F.3d at 601. As we explained above, even if the conduct is not frequent enough to

11

be considered pervasive, it may support a hostile work environment claim if the conduct is sufficiently severe or extreme. *Cerros*, 398 F.3d at 951.

Here, Ms. Heinol's alleged derogatory comments and her political views on immigration issues and the 2016 presidential race, and Ms. Miller's demand that Ms. Valdivia speak English, are far from the kind of "unambiguously racial epithet[s]" that "fall[] on the more severe end of the spectrum." *Nichols*, 755 F.3d at 601. The Seventh Circuit has held that conduct far more extreme than Ms. Valdivia alleges was not severe enough to sustain a hostile work environment claim. *See, e.g., Id.* (holding that calling colleague "black n——r" was "disrespectful" and "deplorable," but "one utterance of the n-word has not generally been held to be severe enough to rise to the level of establishing liability"); *Mercer v. Cook Cty., Ill.*, 527 F. App'x 515, 521 (7th Cir. 2013) (holding that supervisors' comments such as calling employees "bitches" was "certainly boorish and rude," but not sufficiently severe to create a hostile work environment); *Porter*, 700 F.3d at 956 (supervisor's conduct calling the plaintiff a church girl and speaking to her in a high-pitched voice was "inappropriate and rude," but "[o]ffhand comments, isolated incidents, and simple teasing do not rise to the level of conduct that alters the terms and conditions of employment"); *Overly v. KeyBank Nat'l Ass'n*, 662 F.3d 856, 862 (7th Cir. 2011) (supervisor's comments calling subordinate "cutie" were "inappropriate and condescending" but not sufficiently severe to create a hostile work environment); *Ezell*, 400 F.3d at 1048 (7th Cir. 2005) (comments "reflect[ing] some ignorant stereotypes of men, of older workers and of Caucasian workers [we]re rude and inappropriate," but were "not so severe as to change the conditions of [the plaintiff's] employment").

In addition, the evidence Ms. Valdivia presents suggests that she herself did not consider Ms. Heinol's or Ms. Miller's conduct to be severe. Ms. Valdivia took pains not to elevate her

complaints about Ms. Heinol up the District 214 chain of command. In 2011, when Ms. Valdivia contacted Ms. Sacchitello by text to complain about Ms. Heinol, she explicitly asked that Ms. Sacchitello not raise the issue with the Elk Grove principal. Ms. Valdivia also does not recall mentioning Ms. Heinol's or Ms. Miller's alleged conduct to Mr. Simon, the associate principal who replaced Ms. Sacchitello. Although Ms. Valdivia recalls that years later she told Ms. Norris (who was outside Ms. Valdivia's direct chain of command) that Ms. Heinol was a racist, Ms. Valdivia presents no evidence that she asked Ms. Norris to follow up on this allegation. Ms. Valdivia's "inaction in following up on h[er] complaints or taking them up the chain when no apparent action was taken by [her supervisors], belies the notion that [Ms. Heinol's or Ms. Miller's] harassment was severe or pervasive." *Yancick v. Hanna Steel Corp.*, 653 F.3d 532, 545 (7th Cir. 2011).

### C.

The Court also takes into consideration the fact that neither Ms. Heinol's nor Ms. Miller's conduct ever became physically threatening or humiliating to Ms. Valdivia. *Nichols*, 755 F.3d at 601. While Ms. Valdivia contends that she was offended by their alleged comments, she does not suggest that their conduct ever became physically threatening or humiliating. Indeed, as we address further below, most of their comments were not even directed at Ms. Valdivia. This consideration thus weighs against Ms. Valdivia's contention that the conduct was severe or pervasive. *See, e.g., Luckie v. Ameritech Corp.*, 389 F.3d 708, 714 (7th Cir. 2004) (affirming summary judgment where the conduct in question consisted of "isolated events that were not physically threatening or humiliating and in some cases were not even directed" at the plaintiff).

**D.**

We next address whether Ms. Valdivia has presented evidence from which a reasonable jury could conclude that the derogatory comments at issue unreasonably interfered with her work performance. *Nichols*, 755 F.3d at 601. It is undisputed that for the six years Ms. Valdivia worked at Elk Grove, she excelled at her job, received consistently positive reviews and was never disciplined or reprimanded (Pl.'s Resp. to DSOF, ¶ 3). When Ms. Valdivia eventually left Elk Grove to work at Wheeling, she did so because the position at Wheeling offered more pay and prestige than Ms. Valdivia's Elk Grove position (Def.'s Resp. to PSOF, ¶¶ 14- 15).[5]

The fact that Ms. Valdivia excelled at her job -- and stayed at her job for five years after the alleged discriminatory conduct began -- belies her contention that the conduct at issue interfered with her work performance. *See Rosario v. Aunt Martha's Youth Serv. Ctr.*, No. 16-05648, 2017 WL 4882365, at *4-5 (N.D. Ill. Oct. 30, 2017) (granting summary judgment on hostile work environment claim where the plaintiff testified that she continued receiving good performance reviews, indicating that the harassment did not affect her job performance); *Venton v. Million Dollar Round Table*, No. 13-7725, 2015 WL 3777543, at *4 (N.D. Ill. June 16, 2015) (granting summary judgment on hostile work environment claim where the record showed that the plaintiff liked working for her employer and praised her supervisor); *Fudali v. Napolitano*, No. 10-6744, 2014 WL 1097840, at *18 (N.D. Ill. Mar. 20, 2014) (granting summary judgment on hostile work environment claim where there was no evidence that any comments or conduct unreasonably interfered with the plaintiff's ability to perform his job; the plaintiff stated that he

---

[5]In her response brief, Ms. Valdivia appears to suggest for the first time that the work environment at Elk Grove may have caused or contributed to her mental health issues in June or July 2016 (*see* Pl.'s Resp. at 3, "two months after Noemi left Elk Grove, Noemi started psychiatric treatment and she told her psychiatrist how stressed she had been working in this hostile environment for so long"). However, Ms. Valdivia does not develop this argument or cite any specific evidence in support of this contention. Therefore, we need not address the contention here. *See, e.g., Aparicio-Brito v. Lynch*, 824 F.3d 674, 685 (7th Cir. 2016) (court need not consider conclusory allegations that lack factual and legal support).

14

demonstrated impeccable job performance, passed all of his tests on the first attempt, and had a perfect attendance record); *Mannie v. Potter*, 394 F.3d 977, 983 (7th Cir. 2005) (affirming summary judgment for the defendant on a hostile work environment claim in part because the plaintiff offered no proof that she "was unable to perform her job because of the conduct of her supervisors and co-workers"). Thus, the evidence relevant to this factor also supports defendant's contention that Ms. Valdivia has failed to present adequate support for her claim that she was subjected to discriminatory conduct that was severe or pervasive.

### E.

Lastly, we consider whether the alleged comments at issue were directed at Ms. Valdivia. *Nichols*, 755 F.3d at 601. "When harassing statements are directed at someone other than the plaintiff, the impact of such second hand harassment is obviously not as great as the impact of harassment directed at the plaintiff." *Id.* at 602 (internal quotations omitted). Plaintiff argues that Ms. Miller's and Ms. Heinol's alleged comments were directed at her because Ms. Miller directly told her not to speak Spanish, and Ms. Heinol's comments suggesting that Latinos do not deserve a bilingual secretary "were, in fact, directed toward her" because she was the bilingual secretary in the office (Pl.'s Resp. at 8).

While some of the comments were directed at Ms. Valdivia, the record shows that Ms. Valdivia primarily complains about comments that her co-workers made about Latinos and illegal immigrants in general, or Latino families at Elk Grove. Regardless, even if Ms. Valdivia could show that the alleged discriminatory conduct was directed at her, the totality of circumstances shows that Ms. Valdivia has not presented evidence upon which a reasonable jury could find that she was subjected to discriminatory conduct that was severe or pervasive, a

demonstrated impeccable job performance, passed all of his tests on the first attempt, and had a perfect attendance record); *Mannie v. Potter*, 394 F.3d 977, 983 (7th Cir. 2005) (affirming summary judgment for the defendant on a hostile work environment claim in part because the plaintiff offered no proof that she "was unable to perform her job because of the conduct of her supervisors and co-workers"). Thus, the evidence relevant to this factor also supports defendant's contention that Ms. Valdivia has failed to present adequate support for her claim that she was subjected to discriminatory conduct that was severe or pervasive.

### E.

Lastly, we consider whether the alleged comments at issue were directed at Ms. Valdivia. *Nichols*, 755 F.3d at 601. "When harassing statements are directed at someone other than the plaintiff, the impact of such second hand harassment is obviously not as great as the impact of harassment directed at the plaintiff." *Id.* at 602 (internal quotations omitted). Plaintiff argues that Ms. Miller's and Ms. Heinol's alleged comments were directed at her because Ms. Miller directly told her not to speak Spanish, and Ms. Heinol's comments suggesting that Latinos do not deserve a bilingual secretary "were, in fact, directed toward her" because she was the bilingual secretary in the office (Pl.'s Resp. at 8).

While some of the comments were directed at Ms. Valdivia, the record shows that Ms. Valdivia primarily complains about comments that her co-workers made about Latinos and illegal immigrants in general, or Latino families at Elk Grove. Regardless, even if Ms. Valdivia could show that the alleged discriminatory conduct was directed at her, the totality of circumstances shows that Ms. Valdivia has not presented evidence upon which a reasonable jury could find that she was subjected to discriminatory conduct that was severe or pervasive, a

necessary component of her hostile work environment claim. Therefore, the Court grants defendant's motion for summary judgment on this claim.

## IV.

In Count II of her complaint, Ms. Valdivia contends that District 214 "interfered with her rights under the FMLA by failing to provide her with notice or information regarding her right to take job-protected leave pursuant to the FMLA when it became objectively clear that she was suffering from anxiety and emotional distress resulting from one or more psychological conditions" (Compl., ¶ 56). The FMLA entitles eligible employees to take twelve weeks of leave "[b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D). The FMLA defines a serious health condition as "an illness, injury, impairment or physical or mental condition that involves inpatient care . . . or continuing treatment by a health care provider." 29 C.F.R. § 825.113(a). It is unlawful for an employer to interfere with, restrain or deny an employee's attempt to exercise the right to take leave under the FMLA. *Preddie v. Bartholomew Consol. Sch. Corp.*, 799 F.3d 806, 816 (7th Cir. 2015).

To survive summary judgment on an FMLA interference claim, plaintiff must offer evidence that "(1) he was eligible for the FMLA's protections, (2) his employer was covered by the FMLA, (3) he was entitled to leave under the FMLA, (4) he provided sufficient notice of his intent to take leave, and (5) his employer denied or interfered with . . . FMLA benefits to which he was entitled." *Preddie*, 799 F.3d at 816 (internal citations and quotations omitted). Here, District 214 focuses its summary judgment motion on one of these elements: the district contends that Ms. Valdivia has not raised a genuine issue of material fact on her FMLA claim, because she

16

has not presented evidence that would allow a reasonable jury to find that she provided sufficient notice of a serious health condition entitling her to FMLA leave (Def.'s Mem. at 9).

Construed in the light most favorable to Ms. Valdivia, the evidence shows that beginning in June or July 2016 -- about the time she began working at Wheeling -- Ms. Valdivia began feeling overwhelmed and anxious, and she had difficulty eating and sleeping. Ms. Valdivia was confused by these feelings, and although she was only one month into her new job at Wheeling, she started looking for employment closer to her home as a way to cope with these issues. Ms. Valdivia did not know or understand what was happening to her because she had never before received mental health treatment. Ms. Valdivia was crying and emotional when she spoke to Ms. Sisi about leaving Wheeling, and she was crying and emotional when she showed up at Ms. Sisi's house early in the morning on August 9, 2016 to try (unsuccessfully) to rescind her resignation letter five days after presenting it. Eleven days after that, Ms. Valdivia was hospitalized for depression and anxiety.

The FMLA "notice requirement is not demanding: The employee's duty is merely to place the employer on notice of a probable basis for FMLA leave." *Stevenson v. Hyre Elec. Co.*, 505 F.3d 720, 724 (7th Cir. 2007) (internal quotations omitted). "It is enough under the FMLA if the employer knows of the employee's need for leave; the employee need not mention the statute or demand its benefits." *Byrne v. Avon Prods.*, 328 F.3d 379, 382 (7th Cir. 2003). The Seventh Circuit has held that an employee may meet the FMLA notice requirement with "constructive notice" of a serious health condition where an employee is unable to communicate his illness to his employer or there are "clear abnormalities in the employee's behavior." *Stevenson*, 505 F.3d at 726 (citing *Byrne*, 328 F.3d at 381-82). In those cases, "observable changes in an employee's condition" or "uncharacteristic conduct at work" may themselves provide an employer with

17

adequate notice of a serious medical condition. *Burnett v. LFW Inc.*, 472 F.3d 471, 479-80 (7th Cir. 2006). Indeed, direct notice may not be possible if the plaintiff "herself was unaware that she was suffering from a serious medical condition." *Stevenson*, 505 F.3d at 725.[6]

In *Stevenson*, the Seventh Circuit held that a trier of fact could find that the employee's "behavior was so bizarre that it amounted to constructive notice of the need for leave" where she had been a "model employee" for years, before "[h]er behavior changed dramatically." *Stevenson*, 505 F.3d at 726. Likewise, in *Byrne*, the Seventh Circuit found constructive notice where an employee with four years of highly regarded service began to show "unusual behavior," such as sleeping on the job. *Byrne*, 328 F.3d at 382-83. *Compare Guzman v. Brown Cty.*, No. 16-3599, 2018 WL 1177592, at *4 (7th Cir. Mar. 7, 2018) (finding that employer did not have constructive notice of employee's need for FMLA leave because six episodes of oversleeping spread over eighteen months did not constitute the sort of "stark and abrupt change which is capable of providing constructive notice of a serious health condition").

Here, Ms. Valdivia contends that District 214 had constructive notice of a serious health condition under *Byrne*, either because her behavior was so unusual that Ms. Sisi should have been alerted to her condition, or because her severe depressive disorder and moderate to severe generalized anxiety disorder rendered her incapable of providing notice (Pl.'s Resp. at 14-15). Defendant responds that Ms. Sisi did not know Ms. Valdivia well enough to recognize her

---

[6]The Eighth Circuit has called into question the validity of constructive notice in the FMLA context. In *Byrne*, in describing what the Seventh Circuit later termed the "constructive notice" exception under the FMLA, the Seventh Circuit relied on 29 C.F.R. § 825.303(a), an FMLA regulation that provided for an employee to give notice to his or her employer "except in extraordinary circumstances where such notice is not feasible." *Byrne*, 328 F.3d at 382. However, that regulation was amended in 2009, and the extraordinary circumstances language was deleted. 29 C.F.R. § 825.303(a). Thus, in *Scobey v. Nucor Steel-Arkansas*, 580 F.3d 781, 788 (8th Cir. 2009), the Eighth Circuit held that constructive notice is not sufficient to give an employer notice under the FMLA. *See also Miles v. Nashville Elec. Serv.*, 525 Fed. App'x 382, 387 (6th Cir. 2013) (recognizing conflict between Seventh and Eighth Circuits). The Seventh Circuit recently acknowledged this conflict, but declined to address it because the parties did not present the issue on appeal. *Guzman v. Brown Cty.*, No. 16-3599, 2018 WL 1177592, at *4 n.3 (7th Cir. Mar. 7, 2018).

behavior as unusual, and denies that Ms. Sisi ever observed Ms. Valdivia acting so unusual that she was on notice that Ms. Valdivia had a serious health condition (Def.'s Mem. at 10).

While their time together was brief, Ms. Valdivia has presented sufficient evidence to create a triable fact issue as to whether she exhibited bizarre or unusual behavior sufficient to give Ms. Sisi constructive notice of her serious health condition. When Ms. Sisi hired Ms. Valdivia, she knew that Ms. Valdivia came highly recommended by Ms. Sisi's mother and others at Elk Grove, after six years of working there and receiving glowing reviews. By contrast, after Ms. Valdivia obtained a new position at Wheeling, she abruptly announced her resignation barely four weeks into the job. Then, four days after submitting her resignation, Ms. Valdivia surprised Ms. Sisi by showing up at her home at 7:00 a.m. and asking to rescind her resignation. In addition, Ms. Valdivia states that she was crying and distraught in front of Ms. Sisi each time she discussed her decision to leave Wheeling with her. Although defendant disputes this characterization of Ms. Valdivia's "emotional" behavior, that is a fact dispute for the jury to resolve at trial and not for the Court to resolve on summary judgment.

We conclude that Ms. Valdivia's testimony regarding her repeated crying, combined with her actions in seeking to leave her job four weeks after starting it and showing up at her employer's house early in the morning, raise a genuine issue of material fact as to whether Ms. Sisi had constructive notice that Ms. Valdivia had a serious health condition. *See Pagel v. TIN Inc.*, 695 F.3d 622, 628-29 (7th Cir. 2012) (noting that notice inquiry was "best resolved by the trier of fact, particularly, where, as is the case here, the employer and employee dispute the quantity and nature of communications regarding the employee's illness") (internal quotations and citations omitted). As the adequacy of notice is the only issue defendant raises in its motion

on Ms. Valdivia's FMLA interference claim, we deny defendant's motion for summary judgment on this claim.[7]

## CONCLUSION

For the foregoing reasons, defendant's motion for summary judgment is granted in part and denied in part (doc. # 58). The Court grants defendant's motion for summary judgment as to plaintiff's Title VII claim, but denies the motion as to plaintiff's FMLA claim. We set the matter for a status hearing on April 3, 2018 at 9:00 a.m. We direct the parties to discuss with each other the possibility of settlement prior to that status hearing.

ENTER:

SIDNEY I. SCHENKIER
United States Magistrate Judge

DATE: March 20, 2018

---

[7] Defendant also contends that Ms. Sisi could not have had notice that Ms. Valdivia had a serious health condition because plaintiff herself was confused by her behavior and could not identify her condition (Def.'s Mem. at 10). However, a situation where the plaintiff "herself was unaware that she was suffering from a serious medical condition" is one of the circumstances in which the Seventh Circuit has opined that constructive notice might apply. *See Stevenson*, 505 F.3d at 725.